Patricia E. SPYCHALA, Plaintiff,

v.

G.D. SEARLE & CO., Defendant.

Civ. A. No. 86–4209 (MTB).

United States District Court,
D. New Jersey,
Civil Division.

Dec. 21, 1988.

Ira J. Zarin, Newark, N.J., for plaintiff.

Shanley & Fisher, P.C. by Charles A. Reid, III, Francis B. Sheehan, Morristown,

N.J., Venable, Baetjer and Howard by James L. Shea, Baltimore, Md., Jenner & Block by Laura A. Kaster, Chicago, Ill., for defendant.

## OPINION

BARRY, District Judge.

Patricia Spychala brings this action against G.D. Searle & Company ("Searle") alleging that Searle's failure to adequately warn her of the risks associated with use of its Copper 7 ("Cu–7") intrauterine device was a proximate cause of the pelvic inflammatory disease ("PID") she developed and her subsequent infertility. More specifically, Spychala alleges that the information provided to her by Searle, the manufacturer of the Cu–7 device, was insufficient to allow Spychala to make an informed choice as to whether or not the Cu–7 should be utilized. Searle moves for summary judgment, asserting that Spychala's tort claims are preempted by the Food, Drug & Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*, and that, in any event, Searle had no duty to warn the patient directly of the risks associated with use of the Cu–7 device.

## STATEMENT OF FACTS

On September 20, 1984, Spychala visited her gynecologist, Edwin Gervitz, M.D., seeking advice regarding contraceptive devices. She questioned Gervitz about IUD's and asked if he would prescribe one for her. (Spychala Deposition at 23). Spychala acknowledges that, at the time, she was familiar with the Cu–7 manufactured by Searle. (*See* Plaintiff's Opposition at 1). A pelvic examination was performed, Spychala was found to be healthy, and the Searle Cu–7 was prescribed and placed by Dr. Gervitz. (Spychala Deposition at 23–24).

Dr. Gervitz testified that he discussed the complications that can occur with use of the Cu–7 with Spychala and provided her with the patient information pamphlet supplied by Searle. (Gervitz Deposition at 30–31). Spychala read the pamphlet and signed an acknowledgement that she had received and reviewed it. (Spychala Deposition at 26). The pamphlet directed that a patient consult her physician if she had any questions about the Cu–7. (Defendant's Exhibit 1B at 9). Spychala testified that she had no questions for Dr. Gervitz as she "understood pretty much what the book said." (Spychala Deposition at 26).

Within a little more than one month, Spychala began to experience pain and pelvic irritation and on November 2, 1984 was treated at a hospital emergency room. (Complaint, para. 6). The attending physician noted that the IUD was inverted but could not remove it because the thread could not be located. *Id.* Removal of the IUD was, however, recommended and it was removed some time on or near November 8th, after Spychala experienced severe pain and spotting. *Id.* In March, 1985, Spychala was diagnosed as suffering from bilateral pelvic inflammatory disease and was hospitalized for treatment. In April, Spychala was readmitted to the hospital, at which time her left ovary and tube were surgically removed. Apparently, a left tubal ectopic pregnancy was terminated at the time of the surgery. (Complaint, para. 9). In July of 1987, Spychala suffered a right tubal ectopic pregnancy. She contends that the ectopic pregnancies, along with the left tube and ovary removal and adhesions from the PID, have rendered her infertile. (*See* Defendant's Exhibit B, Reports of Dr. Laird).

The Cu–7 is a plastic and copper intrauterine device which releases small amounts of copper into the uterus, and, it is believed, irritates the lining of the uterus thereby interfering with implantation of the egg onto the uterine wall. (*See* 40 Fed.Reg. 27,276, 27,798 (1975)). The Cu–7 may be dispensed only with a prescription and is inserted into the uterus only by or under the supervision of a physician. (Physician labeling, Defendant's Exhibit 1A). In 1970, when Searle decided to market the Cu–7 in the United States, the FDA had broad authority to treat medical "devices" as drugs, thereby subjecting the products to its extensive pre-market review. (*See United States v. Bacto–Unidisk*, 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969); Defendant's Exhibit 4, *Devices Hearings* at 213). Although determining not to reclas-

sify all IUD's as drugs, the FDA decided that certain new products would be treated as "new drugs" and would be regulated as such. (*Devices Hearings* at 246). The FDA notified Searle that its proposed Cu–7 would be treated as a new drug, and Searle began preparing the applications for approval of the IUD and its labeling. On February 25, 1974, the FDA concluded that the Cu–7 was "safe and effective for use as recommended in the submitted labeling." (Defendant's Exhibit 16).

In 1977, the FDA promulgated specific regulations governing the labeling of intrauterine devices considered to be new drugs, otherwise known as "drug IUD's." (21 C.F.R. § 310.502). The FDA was concerned with the availability of information regarding the complications associated with and the side effects of drug IUD use. In order to establish uniform physician and patient labeling, the FDA directed that the labeling directed to the prescribing physician accompanying each drug IUD be substantially as outlined in the regulations. (*Id.* § 310.502(b)(1)). The required physician labeling explained, *inter alia*, the risks associated with ectopic pregnancy and pelvic infection. (*Id.; see also* Physician Labeling, Defendant's Exhibit 1A). Dr. Gervitz was aware of the information accompanying Searle's Cu–7, understood the contraindications for prescription and the potential side effects, and counselled Spychala accordingly. (Gervitz Deposition at 14–15, 28, 31).

The 1977 FDA regulations also state that:

> Labeling, in sufficient quantities to be available to patients who express interest in IUD's, shall accompany each drug IUD (packaged separately from the sterile packaging), be made available to the patient, and contain the following information....

(21 C.F.R. § 310.502(b)(2)). What followed in the information to be provided to prospective IUD users included a list of possible adverse reactions and directions for actions to be taken if particular warning signs appeared. (*Id.*). Among the adverse reactions listed were "Pelvic infection" and "Pregnancy outside the uterus (womb) (tubal or ovarian)." (*Id.*) The patient was advised to contact her physician if she experienced pelvic pain and cramps or experienced thread disappearance. (*Id.*)

The Searle patient information booklet provided to Spychala by Dr. Gervitz was dated 1978. (*See* Defendant's Exhibit 1B; Defendant's Exhibit B). The booklet basically tracks the FDA guidelines at 21 C.F.R. § 310.502(b)(2) and lists ectopic pregnancy and pelvic infection as adverse reactions or side effects which occur "rarely" with the Cu–7. (Defendant's Exhibit 1B at 9). Pelvic pain and cramps and thread disappearance are listed as warning signs requiring the patient to call her physician. (*Id.* at 13).

Spychala filed suit against Searle in October of 1986. As noted earlier, the basis of her claim is "that the Cu–7 IUD was dangerous and defective in providing inadequate warnings to the patient/user thereby inducing the patient to use the Cu–7 and thereby causing and contributing to the damages and injuries alleged." (Plaintiff's Opposition at 1). She asserts that Searle had a duty not only to advise the prescribing physician "about the product and its adverse reactions," but to directly warn potential users of the Cu–7. (*Id.* at 2). Its failure to do so, it is alleged, had the effect of: (1) rendering the product defective; and (2) reducing the information available to Spychala, who, if she had been appropriately apprised of the risks, would not have chosen the Cu–7 and would not have suffered the medical complications she did.

Searle contends, and Spychala has not disputed, that the patient labeling provided with the Cu–7 to Spychala was approved by the FDA. (*See* Defendant's Brief at 4). Spychala's criticism of the information provided to her by Searle is, in actuality, a criticism of the FDA-required labeling and not an allegation that Searle did not comply with the federal regulations. Spychala contends that: (1) Searle should have provided information comparing the Cu–7 with other forms of contraception, although the FDA expressly declined to create such a requirement (42 Fed.Reg. 23,777); (2)

Searle should have provided incidence rates for the various adverse reactions listed and given reasons for the 12% discontinuance rate of the Cu–7, although the FDA guideline labeling is not set up this way; (3) Searle should have listed PID as a possible adverse reaction, rather than merely listing pelvic inflammatory disease, although the FDA determined that explaining PID was better left to the prescribing physician (42 Fed.Reg. 23,773); (4) Searle should not have used the term "side effects" or the phrase "the effects on the offspring when pregnancy occurs with [the Cu–7] in place are unknown," although these are contained in 21 C.F.R. § 310.502(b)(2); (5) Searle's pamphlet misleads the patient into believing that pelvic pain is not a symptom that occurs during the first cycle and that there is no need to call a physician promptly following thread disappearance, although the wording in the pamphlet substantially tracks the FDA guidelines and does not create this impression; and (6) Searle should have included journal and bibliographic references in the pamphlet, although none are required by the FDA and such references would not serve the purpose of § 310.502(b)(2) which is to provide minimal uniform information directly from the manufacturer to potential Cu–7 users to aid in the immediate decision making process. Spychala seeks to impose upon Searle, by way of state tort law, a duty to warn prospective users above and beyond that required by federal law.

Searle has moved for summary judgment, arguing that federal law preempts Spychala's tort claims and that, in any event, New Jersey's "learned intermediary" rule discharged any duty Searle may have had to warn Spychala directly. Although I cannot say with any assurance that Spychala's tort claims are preempted by federal law and, thus, are not properly before this court, I will grant summary judgment in favor of Searle because it has, as a matter of law, satisfied its duty to warn.

## DISCUSSION

a. Preemption

■ The doctrine of federal preemption of state law arises from the Supremacy Clause of Article VI of the United States Constitution. Federal preemption may occur in the following ways:

First, in enacting the federal law, Congress may explicitly define the extent to which it intends to pre-empt state law. Second, even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, or when state law 'stands as an obstacle to the accomplishment and execution of the full purpose and objective of Congress.'

*Michigan Canners & Freezer Ass'n v. Agricultural Mktg. & Bargaining Bd.*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed. 2d 399 (1984) (citations omitted).

Searle contends that Congress expressly preempted state regulation of its Cu–7 labeling when Congress enacted the Medical Device Amendments of 1976, 21 U.S.C. §§ 360 *et seq.* Section 360k provides:

General rule. Except as provided in subsection (b) no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this Act to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act.

The FDA has interpreted section 360k to expressly preempt state requirements, including those established through court decision, which are different from or in addition to federal regulation of medical devices.

[A]fter May 28, 1976, no State or political subdivision of a State may establish or

continue in effect any requirement with respect to a medical device intended for human use having the force and effect of law (whether established by statute, ordinance, regulation, or court decision), which is different from, or in addition to, any requirement applicable to such device under any provision of the act and which relates to the safety or effectiveness of the devices or to any other matter included in a requirement applicable to the device under the act.

21 C.F.R. § 801.1.

Searle argues that, although the Cu–7 had originally been categorized by the FDA as a "new drug," the Medical Device Amendments included transitional provisions pursuant to which certain devices formerly treated as drugs would be reclassified as "Class III" devices. *See* 21 U.S.C. § 360j($l$). Some products were automatically reclassified, yet the FDA specifically recognized at the time that not all "new drugs" were affected by the transitional provisions and stated, in a section entitled "Devices and Drugs Whose Status Is Unchanged," that:

> The Commissioner recognizes that there are a number of products whose previous regulatory status is unchanged by the new definition of 'device'.... The new definition of 'device' did not alter FDA's treatment of those intrauterine devices containing drugs as drugs and other intrauterine devices as devices as explained in [42 Fed.Reg. 23,772].

42 Fed.Reg. 63,474 (1977). The FDA clarified the exemption as follows:

> The agency's policy of treating some IUD's as drugs and others as devices is unaffected by the revised definition of device found in the [Medical Device Amendments].

42 Fed.Reg. 23,772 (1977); *see also Lacy v. G.D. Searle & Co.*, No. 83C–SE–123 (Del. Super.Ct. June 23, 1988) [1988 WL 67825] (LEXIS, States library, Del. file). It then acknowledged that state requirements for *device IUD's* which are different from or in addition to requirements applicable under the Federal Food, Drug & Cosmetic Act are preempted by section 360k. Inexplicably, the FDA made no similar pronouncement for drug IUD's. 42 Fed.Reg. 23,772.

Thus, the express preemptive power of section 360k applies only when state law claims involve medical devices and not prescription drugs. It is clear, at least to me, that the Cu–7 IUD is regulated by the FDA as a drug and falls into the category of drug IUD's which were not reclassified under the Medical Device Amendments. *See also* 21 C.F.R. § 310.502 (acknowledgement of certain medical devices as "drug IUD's").[1] Section 360k does not expressly preempt state law actions challenging the labeling of Searle's Cu–7 and any reliance by Searle upon it is misplaced. *Accord Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293 (D.Minn.1988); *Lacy*, No. 83C–SE–123 (Del.Super.Ct. June 23, 1988).[2]

---

1. Searle has submitted the declaration of Alexander M. Schmidt, M.D., Commissioner of the FDA from June of 1973 to November of 1976. Dr. Schmidt states, "I believe that to interpret the Amendments and regulations in such a way as to remove the Cu–7 from the preemptive provisions of section 360k would be contrary to the intent of Congress in enacting that section." (Defendant's Exhibit 11 at para. 11). It is, indeed, the intent of Congress which I must discern and which determines the extent of section 360k's preemption. Contrary statements by administrators do not control, *Patten v. Lederle Laboratories*, 655 F.Supp. 745, 750 (D.Utah 1987). And, I note, the statements of Dr. Schmidt's successor, Joseph P. Hile, at 42 Fed. Reg. 23,772 & 63,474, are in direct contradiction to the Schmidt declaration. Moreover, Mr. Hile's analysis is published in the Federal Register as the official agency interpretation of the legislative action. *Accord Lacy*, [1988 WL

67825] LEXIS slip opinion at 6 (rejecting Searle's reliance upon Dr. Schmidt's declaration).

2. Searle has cited a plethora of cases in which the preemptive power of section 360k was held to have barred state tort actions challenging the safety of the design or labeling of medical devices. *See, e.g., Stucker v. International Playtex, Inc.*, No. C–87–0440–L(B) (W.D.Ky. Feb. 26, 1988); *Lavetter v. International Playtex, Inc.*, 706 F.Supp. 722 (D.Ariz.1988); *Stewart v. International Playtex, Inc.*, 672 F.Supp. 907 (D.S.C.1987). However, none of the cases cited for this proposition involved a Cu–7 device or other so-called "drug IUD." Rather, the cases held that section 360k preempts state tort actions involving products defined as medical devices, such as tampons or device IUD's. The two cases which addressed the issue of 360k preemption in drug IUD ac-

■] Express preemption aside, Searle contends that from the pervasive scheme of FDA regulation in the area of IUD market approval and labeling can be implied a Congressional intent to occupy the field of safety regulation in drug design, testing and labeling, thereby preempting state tort actions. "In the absence of express preemption there is a strong presumption that Congress did not intend to displace state law." *Graham v. Wyeth Laboratories,* 666 F.Supp. 1483, 1489 (D.Kan.1987) (citing *Maryland v. Louisiana,* 451 U.S. 725, 726, 101 S.Ct. 2114, 2118, 68 L.Ed.2d 576 (1981)). Preemption is not to be inferred from the comprehensiveness of federal agency regulation. *Hillsborough County v. Automated Med. Laboratories, Inc.,* 471 U.S. 707, 717, 105 S.Ct. 2371, 2377, 85 L.Ed.2d 714 (1981). Federal agencies, such as the FDA, are often assigned the task of dealing with regulatory problems in great detail. *Id.* Absent statutory or regulatory language or legislative history evidencing a Congressional intent to exclude state tort law through the alternative use of a comprehensive regulatory effort, federal intent to completely occupy the field of IUD safety regulation should not be implied. *Kociemba,* 680 F.Supp. at 1298 (citing *Hillsborough,* 471 U.S. 707, 105 S.Ct. 2371).

I cannot find sufficient language or legislative history to say with any certainty that Congress intended such a comprehensive regulatory effort that state law should be displaced. Searle quite correctly notes:

> that when the FDA gave notice of the proposed uniform labeling provisions, it did so under a single notice (there was no division into drug and device sections) published in the Federal Register on July 1, 1975.... Although [the language] does not refer directly to preemption ... it does express the intent to treat IUDs uniformly. The notice stated that the FDA proposed to amend section 310.502 (which governs only drug IUDs) "to es-

tablish uniform professional and patient labeling for intrauterine devices." 40 Fed.Reg. 27, 796 (1975). (Ex. 3c to Searle's Br.) The FDA dealt with all comments and changes relating to these proposed regulations as a single group. 42 Fed.Reg. 23,772–23,777 (1977). (Ex. 3d) Moreover, when the FDA issued the final uniform labeling, it made a single summary statement: "The Food and Drug Administration is establishing uniform professional and patient labeling for intrauterine devices (IUDs)." 42 Fed.Reg. at 23,772. (Ex. 3d) (Defendant's Supplemental Submission dated Nov. 28, 1988).

The thrust of the interest in uniform labeling was to assure to the extent possible safe and effective use of both drug and device IUDs and to prevent misleading labeling. There is less sense of a comprehensive regulatory scheme, however, than there is of labeling requirements which must be met at a minimum and certainly no suggestion that if additional requirements were imposed by the states any FDA regulatory scheme for IUD design and labeling would be destroyed. Courts have held with some consistency that while FDA regulation of prescription drugs may establish minimum standards for product design and warning labels, compliance does not necessarily absolve a manufacturer of tort liability. *See, e.g., Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652 (1st Cir.1981); *Salmon v. Parke, Davis & Co.,* 520 F.2d 1359, 1362 (4th Cir.1975); *Kociemba* at 1299; *Lacy* [1988 WL 67825] LEXIS slip opinion at 7. The *Kociemba* court addressed exactly the same contentions made by Searle under similar factual circumstances and concluded:

> The mere fact that the Cu–7 received FDA approval does not, by itself, indicate that Congress impliedly intended to preclude state tort actions against prescription drug manufacturers.

tions, cases which involved Searle's Cu–7, have held that the section does not apply and that

state tort actions against Searle were not preempted. *See Kociemba,* 680 F.Supp. 1293;

*Id.*, 680 F.Supp. at 1299.[3]

Support for my conclusion that preemption was not intended is found in the preamble to the 1978 regulations which provides:

> The Commissioner does not agree that the imposition of a requirement for patient labeling will necessarily affect adversely the standard of civil tort liability which is imposed on drug manufacturers or dispensers. Whether or not a corporation or individual is to be held liable in a given situation will depend upon the facts surrounding the manufacture, sale, and use of the drug product, and on the nature of the injury. It will also depend on the applicable state law, which the Commissioner notes, can be adjusted by state courts and Legislatures in light of the facts presented by patient labeling.

43 Fed.Reg. 4214 (Jan. 31, 1978).

■ Searle's motion for summary judgment on the ground that federal law preempts state law is denied.[4]

**b. The "Learned Intermediary" Rule**

■ Preemption aside, Searle contends that summary judgment should be granted because it had no duty to warn Spychala directly of the risks associated with use of its Cu–7 device. New Jersey adheres to the general rule that a drug manufacturer has a duty to warn intended or foreseeable consumers of a product of the hazards associated with its use. However:

> this duty does not exist where there is an intermediary who 'is not a mere conduit of the product, but rather administers it on an individual basis or recommends it in some way implying an independent duty to evaluate the risk and transmit relevant warnings to the user.'

*Bacardi v. Holzman*, 182 N.J.Super. 422, 424, 442 A.2d 617 (App.Div.1981). In other words, New Jersey recognizes the "learned intermediary" rule whereby, in the case of prescription drugs, a manufacturer satisfies its duty to warn by providing the prescribing physician with information regarding the drug's potential adverse effects. *Id.* at 425, 442 A.2d 617. Importantly, Spychala does not challenge the adequacy of the warning provided by Searle to Dr. Gervitz.

Once the physician has been warned, it is the physician's duty to decide which drug to use and to explain the risks involved. *Calabrese v. Trenton State College*, 162 N.J.Super. 145, 154, 392 A.2d 600 (App.Div. 1978), *aff'd*, 82 N.J. 321, 413 A.2d 315 (1980). Because prescription drugs are often complex in formula and effect, the physician is in the best position to take into account the propensities of the drug and the susceptibilities of the patient, and to give a highly individualized warning to the ultimate user based on the physician's spe-

*Lacy*, No. 83C–SE–123 (Del.Super.Ct. June 23, 1988).

**3.** In this regard, Searle's reliance on *Cipollone v. Liggett Group, Inc.*, 789 F.2d 181 (3d Cir.1986), *cert. denied*, 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987) and *Palmer v. Liggett Group, Inc.*, 825 F.2d 620 (1st Cir.1987) is inappropriate. *Cipollone* and *Palmer* held that Congressional regulation of the cigarette industry through the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331 *et seq.*, preempted state tort actions challenging the adequacy of the warning on cigarette packages. *See Cipollone*, 789 F.2d at 187. However, in enacting uniform labeling requirements for cigarettes, Congress specifically stated its intent to promote commerce and the national economy by eliminating " 'diverse, nonuniform and confusing cigarette labeling' regulations." *Palmer*, 825 F.2d at 626 (quoting 15 U.S.C. § 1331(1) & (2)). Given the express balancing by Congress of nation-al health and commerce interests, and its stated aim to have uniform *and only uniform* labeling, differing state tort law requirements would clearly disrupt the federal scheme. *Id.* Reviewing the Congressional and FDA regulation of drug IUD's, including 21 C.F.R. § 310.502, I find no similar intent.

**4.** For essentially the same reasons, I find Searle's claim that Spychala's state law action would violate the Commerce Clause to be unpersuasive. As noted above, Congress has not mandated that only FDA regulations may be imposed upon prescription drug IUD manufacturers. A minimum level of uniformity was intended; absolute uniformity was not required by Congress. "State regulation ... which does not discriminate against interstate commerce or operate to disrupt its *required* uniformity, may constitutionally stand." *Huron Cement Co. v. Detroit*, 362 U.S. 440, 448, 80 S.Ct. 813, 818, 4 L.Ed.2d 852 (1959) (emphasis added).

cialized knowledge. *Id.; see also Kociemba*, 680 F.Supp. at 1305.

'These drugs were manufactured for administration only by a physician or other authorized person. Generally speaking, only a physician would understand the propensities and dangers involved. The doctor is a learned intermediary between the manufacturer and the ultimate consumer.'

*Calabrese* at 154, 392 A.2d 600 (quoting *Gravis v. Parke–Davis & Co.*, 502 S.W.2d 863, 870 (Tex.Civ.App.1973)).

■ Searle's Cu–7 was a prescription drug which could only be obtained through and inserted by a physician. Dr. Gervitz testified that, based upon Searle's prescribing information and his own specialized knowledge concerning IUD's and their dangers, he chose to prescribe the Cu–7 for Spychala. (Gervitz Deposition at 13–15, 33–35). Even absent an express warning from a drug company, which, of course, was present here, that company will not be liable if the physician had sufficient knowledge from other sources. *Stanback v. Parke, Davis and Co.*, 657 F.2d 642, 645 (4th Cir.1981); *Schrammel v. G.D. Searle & Company*, No. 86–0198 (E.D.Pa. Nov. 4, 1988) [1988 WL 118850] (LEXIS 12465).

■ Spychala argues, however, that the learned intermediary rule should not apply to prescription contraceptives because contraceptives are not therapeutic, curative or diagnostic and their use is often initiated by the patient. Moreover, manufacturers may advertise directly to these patient-users and, therefore, Spychala argues, that a direct duty to warn the ultimate consumer should be imposed.

Because a woman plays an important role in the decision making process involving contraceptive use, some courts have created an exception to the learned intermediary rule. *See, e.g., Odgers v. Ortho Pharmaceutical Corp.*, 609 F.Supp. 867 (E.D.Mich.1985); *Stephens v. G.D. Searle*, 602 F.Supp. 379 (E.D.Mich.1985); *MacDonald v. Ortho Pharmaceutical Corp.*, 394 Mass. 131, 475 N.E.2d 65 (1985). However, these cases, cited by Spychala, represent the minority view and the Michigan cases are of questionable precedential value.[5] The overwhelming majority of decisions "have applied the learned intermediary rule to cases involving contraceptives." *Kociemba*, 680 F.Supp. at 1305 (citing, *inter alia, Beyette v. Ortho Pharmaceutical Corp.*, 823 F.2d 990 (6th Cir.1987); *Dupre v. G.D. Searle*, No. C84–146–L (D.N.H. 1987); *Goodson v. Searle Laboratories*, 471 F.Supp. 546 (D.Conn.1978); *Chambers v. G.D. Searle*, 441 F.Supp. 377 (D.Md.1975), *aff'd* 567 F.2d 269 (4th Cir. 1977)). Although a woman may be actively involved in the decision to use contraceptives, those contraceptives are administered only by prescription and upon the advice of a physician. The insertion of an IUD, in particular, requires the physician's services, knowledge and skill. *Kociemba* at 1306 (quoting *Terhune v. A.H. Robins*, 90 Wash. 2d 9, 577 P.2d 975, 978 (1978)). There is no reason apparent to me to differentiate between contraceptives and other prescription drugs to which the learned intermediary rule applies.

■ Spychala argues next that, by virtue of 21 C.F.R. § 310.502, a duty has been

---

**5.** The Michigan Supreme Court determined that there was no rule of law on the subject in Michigan and stated that the legislature was in a better position than the courts to allocate duties. *In re Certified Questions*, 419 Mich. 686, 697, 358 N.W.2d 873 (1984), *reh'g denied* 421 Mich. 1202 (1985). Nonetheless, both *Odgers* and *Stephens* predicted that if the Michigan Supreme Court were again presented with the issue, it would most likely decide that the learned intermediary doctrine is inapplicable in cases involving oral contraceptives. Subsequently, the Sixth Circuit, citing *Smith v. E.R. Squibb & Sons, Inc.*, 405 Mich. 79, 273 N.W.2d 476, 479 (1979), held that a manufacturer of a pharmaceutical product

has a duty to warn the medical profession, not the patient, of risks inherent in the use of the product. *Beyette v. Ortho Pharmaceutical Corp.*, 823 F.2d 990, 992 (6th Cir.1987). The proposition for which *Smith* was cited was, however, dicta and described as such by the Michigan Supreme Court in *In re Certified Questions*, 419 Mich. at 697, 358 N.W.2d 873. The situation in Michigan, therefore, is less than clear, although it appears that a Michigan case postdating *Odgers* and *Stephens* has applied the learned intermediary rule in a case involving a prescription contraceptive. *Mowery v. Crittenton Hosp.*, 155 Mich.App. 711, 400 N.W.2d 633 (1986).

placed upon manufacturers of drug IUD's to warn prospective patients directly. That regulation, effective November 7, 1977, requires manufacturers to supply uniform labeling with each IUD package, containing essentially the information outlined at 21 C.F.R. § 310.502(b)(2). These so-called "patient brochures" or "pamphlets" are then given to the ultimate consumer by the physician and the patient is advised to inquire of her physician if she has any questions. Spychala contends that prior to the enactment of § 310.502(b)(2):

> the duty of a manufacturer to warn the patient user directly was voluntary—since that time, the federal regulation controlled and effectively changed the old ways. It is the regulation at 21 C.F.R. § 310.502(b)(2) that *requires manufacturers* of drug-IUDs to include warnings to each IUD user.

(Plaintiff's Opposition at 4 (emphasis in original)).[6]

■ Generally, a manufacturer has no duty to assist the learned intermediary in warning patients of the risks inherent in prescription medicine. *Polley v. Ciba–Geigy Corp.*, 658 F.Supp. 420, 421 (D.Alaska 1987). Patient brochures provided by the manufacturer to physicians for distribution to the consumer may aid the physician in communicating with his patient but do not establish the undertaking by the drug manufacturer of a voluntary duty to warn the patient directly. *Id.* Moreover, to the extent that § 310.502(b)(2) requires manufacturers such as Searle to provide certain information to Cu–7 users, it undercuts if not abrogates the learned intermediary rule and should be narrowly construed. "The learned intermediary rule carefully allocates the duties of educating physicians, on the one hand, and warning patients, on the other, of the risks inherent in prescription medicines." *Polley* at 421. This careful allocation, well established in New Jersey, should be disrupted only to the extent necessary to carry out the purpose of the federal regulations.

■ Spychala has not disputed Searle's claim that it supplied the patient information required by 21 C.F.R. § 310.502(b)(2) and that that information was approved by the FDA. Therefore, Searle has met its statutorily imposed burden or duty to warn Spychala. New Jersey's learned intermediary rule precludes a tort action based upon a duty to warn above and beyond that required by the federal regulations.[7] Searle's motion for summary judgment is granted.

The court will issue an appropriate order.

---

6. In fact, because the plaintiff in *Kociemba* had received her Cu–7 prior to the effective date of 21 C.F.R. § 310.502, the court specifically stated that it "need not address the issue of whether Searle had a duty pursuant to the regulation to warn plaintiff." *Id.* at 1306 n. 7.

7. I note that, were I to disregard the learned intermediary rule and find Searle had a duty to directly warn Spychala, and, therefore, an obligation to do so "reasonably," Searle fulfilled its duty. At least one court interpreting FDA regulations requiring a manufacturer of prescription drugs, in that case oral contraceptives, to warn patients directly noted that the requirements of a legislative enactment or administrative regulation may be adopted by a court as the standard of conduct to be followed by a reasonable man. *See Lukaszewicz v. Ortho Pharmaceutical Corp.*, 510 F.Supp. 961, 964 (E.D.Wis.1981). By satisfying its obligation to comply with § 310.502, Searle acted as a reasonable manufacturer and provided adequate warning to Spychala.