713 A.2d 588 (1997)
313 N.J. Super. 646
Saray PEREZ, Cheryl Bailey, Kimberly Bartlett, Anna Cesareo and Soraya Arias, Plaintiffs,[1]
v.
WYETH LABORATORIES, INC., a subsidiary of American Home Products Corporation; American Home Products Corporation; Wyeth-Ayerst Laboratories Division of American Home Products Corporation; Wyeth-Ayerst International Inc.; Wyeth-Ayerst Laboratories Company and Dow Corning France, S.A., Defendants.
Superior Court of New Jersey, Law Division, Middlesex County.
Argued November 21, 1997.
Decided December 5, 1997.
*589 Frances Tomes, East Brunswick, for plaintiffs (Richard Galex, on brief) (Galex, Tortoreti & Tomes).
Anita Hotchkiss, Morristown, for defendants (Anita Hotchkiss, Linda Pissott Reig, and Toby A. Holbreich, on brief) (Porzio, Bromberg & Newman).
CORODEMUS, J.S.C.

I.
The Norplant System is a long-term, reversible birth control method which consists of six capsules. Each capsule contains the synthetic hormone levonorgestrel and is implanted below the skin of the patient's arm. The system provides contraception for up to five years but may be removed to permit a women to become fertile.
Norplant was designed and developed by The Population Council. The Population Council is a nonprofit organization committed to the advancement of reproductive health. In 1966, The Population Council began development of Norplant and over the next two decades tested the system on more than 55,000 women in forty-four countries. The Population Council granted Wyeth Laboratories Inc. the exclusive right to market Norplant in this country and, in December 1990, the FDA approved The Population Council's and Wyeth's New Drug Applications. Subsequently, in 1991, Wyeth began distributing Norplant with the labeling approved by the FDA.
Beginning in June 1995, plaintiffs began to file complaints in the various counties of this state alleging personal injuries from their use of the Norplant System. There are currently twenty-six Norplant cases consolidated in Middlesex County, which involve fifty Norplant recipients. Prior to the consolidation of these cases, defendants had filed motions to compel the production of plaintiffs' expert reports. After consolidation, however, several different judges in Middlesex County ordered that thirteen of the plaintiffs produce the reports between twenty and sixty days.
Subsequently, this court assumed responsibility for the management of the Norplant litigation and, on March 7, 1997, held a case management conference to address the service of plaintiff's expert reports, among other things. The court vacated the prior orders and proposed that expert reports be filed within thirty days. In response to Judge Richard Schell's ruling in In re Norplant Contraceptive Prods. Liab. Litig., 955 *590 F.Supp. 700 (E.D.Tex.1997), however, plaintiffs' counsel opposed the production of the reports and suggested that the court determine the applicability of the learned intermediary doctrine to these matters. Five plaintiffs were chosen to be bellwether plaintiffs and to challenge defendants' motions for summary judgment concerning the issue of the learned intermediary doctrine. Although these plaintiffs allege varying problems associated with their use of Norplant, all of them complain that Wyeth did not warn of the pain and scarring that resulted from the capsules' removal. A description of the five bellwether plaintiffs and their healthcare providers follows.
Soraya Arias
Ms. Arias had Norplant inserted on March 12, 1993 and removed more than two years later. She complains that Norplant has caused her to suffer from weight gain, headaches, nausea, vomiting, fatigue, irregular menstruation, hair loss, leg cramps, anxiety and nervousness, vision problems, anemia, mood swings and depression, high blood pressure and nightmares. Additionally, she alleges that she experienced a difficult and painful removal of Norplant which resulted in scarring.
Ms. Arias' Norplant was prescribed and inserted by Dr. Ashgar Chuback. Dr. Chuback is a Board Certified Obstetrician and Gynecologist. Prior to prescribing Norplant, the doctor was aware of the risks and side effects of Norplant.
Kimberely Bartlett
Ms. Bartlett had Norplant inserted on January 13, 1994. Norplant, however, was removed from her arm eleven months afterwards so she could become pregnant. Although Ms. Bartlett never reported any complaints to any healthcare providers while using Norplant, she alleges that she suffers from mood swings, nervousness, fatigue, hair loss, blurred vision, rash, weight gain, bloating, and irregular menstruation. Ms. Bartlett also contends that the removal was painful and resulted in scarring.
Ms. Bartlett's Norplant was prescribed and inserted by Dr. Chandravdan Shah. Dr. Shah is a Board Certified Obstetrician and Gynecologist. In his deposition, he stated that he believed that Norplant is "safe and effective" and that Wyeth's labeling "fairly and accurately describe[s] the risks and benefits associated with Norplant." The doctor's opinion is based upon his training, experience, and review of medical journal articles. Even though he is aware of the possible side effects of Norplant, Dr. Shah still believes that Norplant is an effective and safe form of contraception.
Cheryl Bailey
Ms. Bailey had Norplant inserted on August 6, 1992 and removed nearly five years later for non-medical reasons. In her deposition, Ms. Bailey stated that Norplant has caused her to suffer from irregular menstruation, weight gain, facial hair growth, numbness in leg and arm, fatigue, headaches, and dizziness. She also complains that the removal of Norplant resulted in pain and scarring.
Ms. Bailey's Norplant was prescribed and inserted by Dr. Gregory Carlson. Dr. Carlson is Board Certified in family medicine. The doctor believes that Norplant is as "safe as other forms of birth control." Dr. Carlson's opinion is based upon his experience, training, discussions with colleagues, and reference articles in medical periodicals. Prior to prescribing Norplant to Ms. Bailey, Dr. Carlson was aware of many of Norplant's potential side effects. Despite this knowledge, he finds Norplant to be a safe and effective contraceptive choice and would prescribe Norplant for Ms. Bailey again.
Anna Cesareo
Ms. Cesareo had Norplant inserted on May 20, 1993 and removed on September 20, 1995. She alleges that Norplant has caused headaches, hair loss, irregular menstruation, visual disturbances, nausea, vomiting, stomach cramps, depression, mood swings, emotional upset, breast tenderness, chest pain, muscle pains, fatigue and lighheadedness. She also complains of odor, diarrhea excessive urination and pain and scarring from the removal of Norplant.
Ms. Cesareo's Norplant was prescribed and inserted by Dr. Francine Sinofsky. Dr. Sinofsky is certified in Obstetrics and Gynecology *591 by the American Board of Obstetrics and Gynecology. After joining Rutgers Medical School in 1985, she was a co-investigator for a clinical trial of Norplant. The doctor has also written several articles on different contraceptive devices, including Norplant. Before recommending Norplant to Ms. Cesareo, Dr. Sinofsky was aware of the risks and side effects of Norplant. Despite the risks, she believes that Norplant is a safe and effective form of birth control and that the labeling for Norplant is sufficient.
Saray Perez
Ms. Perez had Norplant inserted on August 18, 1994 and removed two years later on April 23, 1996. She believes that Norplant has caused irregular menstrual bleeding, weight gain, hair loss, hair growth on chin, headaches, acne, idiopathic intracranial hypertension, depression, and arm pain. She also alleges that she experienced a difficult, painful removal process which included scarring.
Ms. Perez's Norplant was prescribed and inserted by Nurse Diane Brevet. Nurse Brevet is certified in women's health by the National Association of Obstetricians and Gynecologists. She is authorized by law to prescribe and insert Norplant. Nurse Brevet believed that Wyeth "fairly and accurately described the risks and benefits" of Norplant. Understanding these risks, she believed that Norplant was still the appropriate choice of contraception for Ms. Perez.

II.
This court recognizes the unique effect that this opinion will have on future Norplant litigation. Norplant may be properly described as a mass tort. Mass torts may be distinguished from other personal injury claims by several distinguishing features. First, mass torts involve large number of claims that are associated with a single product. Second, despite the number of claimants, there is a commonality of factual and legal issues. Third, there is a value interdependence between the different claims. Unlike other torts, causation and liability in mass torts are often dependent upon the success or failure of prior lawsuits. Fourth, mass torts frequently involve both temporal and geographic dispersion. Although mass torts may require state law to be altered or refined in the future, this court believes that the learned intermediary doctrine may be applied in this matter without modification.

III.
Under Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995), an issue of material fact exists if the competent evidence presented by the non-moving party is sufficient to permit a rational factfinder to resolve the alleged dispute in favor of that party. Id. at 533, 666 A.2d 146. In a summary judgment motion, a court "must grant all the favorable inferences to the nonmovant." Id. at 536, 666 A.2d 146. This court must inquire whether the evidence presents a sufficient disagreement to require submission to the fact-finder or whether it is so one-sided that defendant must prevail as a matter of law. Id.
In a strict liability action for a defective product, a plaintiff must show not only that a product was defective when it left the manufacturer's control but also that the defect proximately caused the plaintiff's injuries. Coffman v. Keene Corp., 133 N.J. 581, 593, 628 A.2d 710 (1993). In a failure to warn case, the defect is the absence or inadequacy of a warning that a product may cause injury. Id.; London v. Lederle Labs., 290 N.J.Super. 318, 327, 675 A.2d 1133 (App. Div.1996), rev'd in part on other grounds, 152 N.J. 14, 702 A.2d 471 (1997) (per curiam). In cases involving prescription drugs, "the issue is whether the warning should have been given to the prescribing physician; there is no requirement that the manufacturer warn the patient herself." Id.
An explanation of the manufacturer's duty to the ultimate consumer may be found in the New Jersey Products Liability Act ("Act"), N.J.S.A. 2A:58C-4. The Act states that:
[i]n any product liability action the manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction or, in the case of dangers a manufacturer or seller discovers or reasonably should discover after the product *592 leaves its control, if the manufacturer or seller provides an adequate warning or instruction. An adequate warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communication adequate information on the dangers and safe use of the product ... in the case of prescription drugs, taking into account the characteristics of, and the ordinary knowledge common to, the prescribing physician.
Id. Additionally, there is a rebuttable presumption that the warning or instruction is adequate if the warning or instruction was "given in connection with a drug or device... has been approved or prescribed by the federal Food and Drug Administration under the `Federal Food, Drug, and Cosmetic Act.'..." Id. The manufacturer's duty to warn in the statute is closely related to the legal concept known as the learned intermediary doctrine.
The learned intermediary doctrine provides that a manufacturer "discharges its duty to warn the ultimate consumer user by supplying physicians with information about the drug's dangerous propensities." Niemiera v. Schneider, 114 N.J. 550, 561, 555 A.2d 1112 (1989). Informing a physician discharges the manufacturer's duty because "the physician is in the best position to take into account the propensities of the drug and the susceptibilities of the patient, and to give a highly individualized warning to the ultimate user based on the physician's specialized knowledge." Spychala v. G.D. Searle & Co., 705 F.Supp. 1024, 1031-32 (D.N.J.1988). When the manufacturer has properly warned the physician, "the choice of which drugs to use, and the duty to explain the risks involved, is his." Calabrese v. Trenton State College, 162 N.J.Super. 145, 392 A.2d 600 (App.Div.1978), aff'd, 82 N.J. 321, 413 A.2d 315 (1980). Because the plaintiff has the burden of proving proximate cause, he or she "must show that adequate warnings would have altered the doctors' decision to prescribe the pharmaceutical." Strumph v. Schering Corp., 256 N.J.Super. 309, 323, 606 A.2d 1140 (App.Div.1992) (Skillman, J., dissenting), rev'd 133 N.J. 33, 626 A.2d 1090 (1993) (reversing for reasons expressed in Judge Skillman's dissent).
Despite the above, plaintiffs argue that the learned intermediary doctrine is inapplicable to Norplant and ask that this court adopt an exception to the doctrine. There are two recognized exceptions to the learned intermediary doctrine in this country. The first exception involves when a drug is administered in a setting, such as mass immunizations, where there is no physician intermediary. See Edwards v. Basel Pharmaceuticals, 933 P.2d 298, 301 (Okla. 1997) (describing exceptions to learned intermediary doctrine).
The second exception involves oral contraceptives. Only one jurisdiction, however, Massachusetts, has officially adopted this exception. In MacDonald v. Ortho Pharmaceutical Corp., 394 Mass. 131, 475 N.E.2d 65, cert. denied, 474 U.S. 920, 106 S.Ct. 250, 88 L.Ed.2d 258 (1985), the court held that a manufacturer of oral contraceptives owes a direct duty to consumers to warn of the drug's dangers. Id. 475 N.E.2d at 68. The court determined that oral contraceptives are different from other prescription drugs because the patient is actively involved in the decision making process. Id. at 69. The doctor, unlike other prescription drugs, performs a "relatively passive role." Id.
This court, however, is not persuaded by the MacDonald court's analysis of contraceptives and their differences from other prescription drugs. Recently, the court in In re Norplant Contraceptive Prods. Liab. Litig., 955 F.Supp. 700 (E.D.Tex.1997) reviewed the Massachusetts rule. It observed that "[t]he fact that the patient plays a role in deciding to use a particular prescription drug does not diminish the physician's role in determining her suitability for different drugs and in counseling with her as to the benefits and potential risks of each." Id. at 707.
This view has been accepted by other courts. In Spychala v. G.D. Searle & Co., 705 F.Supp. 1024 (D.N.J.1988), the court rejected a similar argument that the learned intermediary device was inapplicable to intrauterine devices because the patient played an *593 active role in the decision to use the device. The court stated that "[a]lthough a woman may be actively involved in the decision to use contraceptives, those contraceptives are administered only by prescription and upon the advice of a physician. The insertion of an IUD, in particular, requires the physician's services, knowledge and skill." Id. at 1032.
Although the above courts' opinions have no binding authority on this court, this court does find their reasoning to be very persuasive. The learned intermediary doctrine exists because of the special nature of prescription drugs. In Torsiello v. Whitehall Labs., 165 N.J.Super. 311, 398 A.2d 132 (App.Div.), certif. denied, 81 N.J. 50, 404 A.2d 1150 (1979), Judge Pressler discussed the unique differences between prescription and over the counter medications. Manufacturers of nonprescription drugs are required to warn consumers because the drugs "are purchased by consumers for the purpose of self-medication typically without intended or actual intervention by a physician." Id. at 322, 398 A.2d 132. With prescription medications and drugs, however, the doctor as an "`intermediary is not a mere conduit of the product but rather administers it on an individual basis, or recommends it in some way, implying an independent duty to evaluate the risks and transmit relevant warnings to the user.'" Id. at 323, 398 A.2d 132 (quoting Rheingold, Products Liability: The Ethical Drug Manufacturer's Liability, 18 Rutg.L.Rev. 947, 985-86 (1964)). The learned intermediary's duty is to weigh "`the benefits of any medication against its potential dangers. The choice he [or she] makes is an informed one an individualized medical judgment bottomed on a knowledge of both patient and palliative." Id. (quoting Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1276 (5th Cir.), cert. denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974)). Additionally, as the Calabrese court observed, prescription "`drugs were manufactured for administration only by a physician or other authorized person.... [O]nly a physician would understand the propensities and dangers involved.... These professionals are in the best position to evaluate the warnings put out by the drug industry.'" Calabrese, supra, 162 N.J.Super. at 154, 392 A.2d 600 (citation omitted).
Even though a woman may be actively involved in deciding whether or not to take contraceptives, the fact cannot be ignored that she may not legally gain access to prescriptive, contraceptive drugs without the assistance of a doctor or other healthcare worker. Like the insertion of an IUD, the implantation of Norplant requires the assistance, skill and knowledge of a healthcare worker. Thus, this court declines to adopt the Massachusetts exception for contraceptives because there is no apparent reason "to differentiate between contraceptives and other prescription drugs to which the learned intermediary applies." Spychala, supra, 705 F.Supp. at 1032.
A third exception suggested by the plaintiffs is that the learned intermediary doctrine does not apply when the manufacturer advertises directly to the consumer. This possible third exception is based upon footnote four in Garside v. Osco Drug, Inc., 764 F.Supp. 208, 211 fn. 4 (D.Mass.1991), rev'd, 976 F.2d 77 (1st Cir.1992). In the footnote, the court stated that "[i]n an appropriate case, the advertising of a prescription drug to the consuming public may constitute a third exception to the learned intermediary rule. By advertising directly to the consuming public, the manufacturer bypasses the traditional patient-physician relationship, thus lessening the role of the `learned intermediary.' " Id. Because a manufacturer has advertised to the general public, plaintiffs argue that the manufacturer has made a determination that the physician, as the learned intermediary, is not required. Moreover, in their reply, plaintiffs contend that the defendants' advertising campaign interferes with the learned intermediary doctrine because the woman chooses the form of contraception and the campaign encourages women to "ask their physicians for Norplant to the exclusion of any other birth control drug or method."
Unlike the Massachusetts rule, however, this court is not persuaded that an exception to the learned intermediary doctrine exists in New Jersey when a manufacturer chooses to *594 directly advertise to the general public. Even though a woman may investigate various methods of contraception and be influenced by a manufacturer's advertising campaign, a physician is not simply relegated to the role of prescribing the drug according to the woman's wishes. The doctor still has a duty to weigh the risks and benefits associated with the drug. Moreover, he or she must determine whether the drug is appropriate for the woman. Thus, although a manufacturer may directly advertise to the consuming public, it is still protected by the learned intermediary doctrine when it adequately warns the physician or other qualified healthcare worker pursuant to N.J.S.A. 2A:58C-4.[2]

IV.
Because the learned intermediary doctrine applies to this matter, the issue before this court becomes whether the defendants adequately warned physicians and other qualified healthcare workers of the risks associated with Norplant. As stated above, a prescription drug warning is adequate if the warning, "taking into account the characteristics of and the ordinary knowledge common to, the prescribing physician", is one that a reasonably prudent person would have provided with respect to the dangers and safe use of the drug. N.J.S.A. 2A:58C-4. A presumption of adequacy arises, however, when the manufacturer's warnings, as is here, are approved by the FDA. The plaintiff has the burden of proving that the manufacturer's warnings were inadequate and that warnings were the proximate cause of her injuries. Strumph, supra, 256 N.J.Super. at 323, 606 A.2d 1140 (Skillman, J. dissenting). For a plaintiff to satisfy her burden, she "must show that adequate warnings would have altered her doctor's decision to prescribe" the drug. Id. Thus, this court is concerned with the effect that a warning had on the doctor and not on the consumerplaintiff.
In their reply, plaintiffs contend that the defendants did not adequately warn them of the scarring and pain associated with the removal of the capsules.[3] In affidavits, they stated that they would not have chosen Norplant had they been warned about the scarring and painful removal process.[4] Defendants counter, however, that none of the plaintiffs complained of the scarring or pain in their answers to interrogatories. They argue that plaintiffs have presented no evidence to suggest that the healthcare providers in this matter would find Wyeth's warnings about the removal procedure and its effects to be inadequate. Defendants maintain that their warnings did, in fact, inform of the scarring and pain risks associated with Norplant's removal. Finally, they argue that plaintiffs have not rebutted the warnings' presumption of adequacy arising from their approval from the FDA.
Despite the above arguments of the plaintiffs, each doctor and Nurse Brevet stated during their depositions that they either considered the defendants' warnings to be sufficient when they prescribed Norplant or were warned about the contraceptive's side effects. The defendants specifically warned physicians that removal difficulties may include scarring, bruising, ulceration and sloughing.[5] Wyeth also warned that if the capsules were difficult to remove, "an additional visit and incision may be required." *595 Plaintiffs have not offered any expert opinion that Wyeth's warnings regarding pain and scarring were inadequate or that a different warning from Wyeth would have altered the healthcare workers' decisions to prescribe Norplant. Moreover, plaintiffs have not presented any expert testimony which rebuts the warnings' presumptions that they are adequate. Consequently, this court grants defendant's motion for summary judgment as it pertains to these five bellwether plaintiffs.
NOTES
[1] The caption has been amended to show as plaintiffs the five "bellwether" individuals chosen from five consolidated cases, all against the same defendants. The other plaintiffs are: Camellia Daniels, Debra Little, Dria Moore, Melinda Rojas, Jamella Muhammad, Veda Sellers, Michelle Diaz and Sayed B. Pacha Said.
[2] Even if there were such an exception to the learned intermediary doctrine, it would not apply to these plaintiffs because they admitted during their depositions that they never saw any advertisements for Norplant. Additionally, none of the advertisements that plaintiffs refer to in their reply brief are before this Court.
[3] Based upon plaintiffs' brief and oral argument, the scarring and pain are the only complaints about which they argue defendants did not adequately warn.
[4] For example, in her affidavit, Anna Cesareo stated:

I never read any medical literature nor was I warned by any health care provider that the removal of the Norplant could be difficult, could be painful and would result in a noticeable scar.... If in fact there had been a warning about noticeable scarring or painful removal, I would have heeded the warning and would have opted for a different less painful and damaging contraceptive.
[5] Importantly, none of the bellwether plaintiffs complained of difficult removals or that they have significant scarring.