# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3116-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

Y.K.,

     Defendant,

and

R.W.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
C.W., a minor.

_____

Submitted June 1, 2021 – Decided August 23, 2021

Before Judges Hoffman and Smith.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0011-20.

Joseph E. Krakora, Public Defender, attorney for appellant (Deric Wu, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Travis A. Provost, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Louise M. Cho, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Appellant, R.W., the father of C.W., appeals from a March 19, 2020 order terminating his parental rights and awarding guardianship to the Division of Child Protection and Permanency (Division). R.W. argues that the judge erred in finding the Division proved that he harmed or would harm C.W. While not raised below, R.W. also argues that the judge improperly made findings on allegations not pled in the guardianship complaint. The Division and the Law Guardian urge that we affirm and permit C.W. to be adopted. They argue that the family court correctly found all prongs of N.J.S.A. 30:4C-15.1(a) had been established by clear and convincing evidence and that it is in C.W.'s best interest

2

that she be adopted by the foster parent that has cared for her for more than two-and a-half years. Having reviewed the parties' contentions and the applicable law, we affirm substantially for the reasons explained by Judge Nora J. Grimbergen in her thorough written opinion.

I.

We glean the facts from the record developed at the guardianship trial held on February 27, 2019. The Division introduced over ninety exhibits and presented testimony from three witnesses: two Division caseworkers, Permanency Worker Aneika Carter and Division Adoption Worker Erika Sweat, as well as an expert in psychology, Dr. Mark Singer, who testified on parental fitness and bonding. R.W. did not testify, nor did he call any witnesses at trial. The Law Guardian for C.W. called no witnesses, and the mother, Y.K., executed a voluntary surrender of her parental rights as to C.W. on January 24, 2020. Because the facts are detailed in Judge Grimbergen's comprehensive opinion, we present a summary here.

C.W. was born to R.W. and Y.K. in October 2018. The parents were previously involved with the Division in July 2017 when the mother gave birth to another child, H.W., and tested positive for THC. R.W. was eventually dismissed from H.W.'s case on September 26, 2018 because paternity tests

revealed that R.W. was not H.W.'s biological father. Prior to his dismissal from the case, R.W. became embroiled in over a dozen incidents of program non-compliance and confrontations with Division caseworkers and service providers in relation to H.W. These incidents included, but were not limited to: testing positive for cocaine in July 2017; refusing to attend the corresponding substance abuse and mental health intake two weeks later in August 2017; screaming profanities while visiting with H.W. at a Division office, resulting in him being escorted out of the building in October 2017; threatening to give Human Services Police officers a reason to draw their weapons during another visit with H.W. the same month; cancelling multiple program appointments; arguing with security during another visit with H.W. in August 2018; calling a doctor treating H.W. a "bitch" and threatening her if she performed a recommended medical procedure on H.W; and threatening to remove C.W. from the hospital after her birth in defiance of the social hold the Division placed on her in October 2018.

C.W. was medically discharged on November 12, 2018 and the Division placed her in a Division foster home. On November 15, 2018, the Division filed a verified complaint for custody, care and supervision of C.W. under docket number FN-07-0164-19. Both parents were inconsistent and habitually late in

4

attending Division arranged visits with their child. The Division eventually terminated visitation on March 27, 2019 due to the parents' noncompliance.

On June 11, 2019, the judge issued a permanency order approving the Division's plan for termination of Y.K. and R.W.'s parental rights to C.W. Two compliance reviews were held before trial, one each in September and October 2019.

On March 19, 2020, after weighing the evidence presented by the Division, the judge issued an order terminating R.W.'s parental rights and finding the Division met its burden of proof as to all four prongs of N.J.S.A. 30:4C-15.1(a). R.W. appeals.

II.

The legal framework regarding the termination of parental rights is well-settled. Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, that right is not absolute. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009); In

re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test for determining when parental rights must be terminated in a child's best interests.

In order to obtain parental termination, N.J.S.A. 30:4C-15.1(a) requires the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11. The four prongs of the test are not "discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J.

6

at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Child. by L.A.S., 134 N.J. 127, 139 (1993)).

Our review of a family judge's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "When a biological parent resists termination of his or her parental rights, the [trial] court's function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006).

"We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012) (citing Cesare, 154 N.J. at 413). "We recognize that the cold record, which we review, can never adequately convey the actual happenings in a courtroom." Ibid. (citing N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). We will not overturn a family court's factfindings unless they are so "'wide of

the mark'" that our intervention is necessary to correct an injustice. Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights. Ibid.

### III.

R.W. argues that the Division failed to prove that he substantially caused harm to C.W., and consequentially did not meet its burden under N.J.S.A. 30:4C-15.1(a)(1). We disagree. The first prong requires the Division to prove that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship . . . ." N.J.S.A. 30:4C-15.1(a)(1). "Although a particularly egregious single harm can trigger the standard, the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. "[T]he attention and concern of a caring family is 'the most precious of all resources.'" In re Guardianship of DMH, 161 N.J. 365, 379 (1999) (quoting A.W., 103 N.J. at 613). "[W]ithdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Ibid. "Courts need not wait to act

8

until a child is actually irreparably impaired by parental inattention or neglect." Id. at 383 (quoting A.W., 103 N.J. at 616 n.14).

The judge heard testimony from the two Division caseworkers, Aneika Carter and Erika Sweat, as well as Dr. Singer. The judge noted that R.W. had been diagnosed with bipolar disorder but was discharged from mental health and medical monitoring programs for non-compliance, and he had not re-enrolled as of trial. She found R.W. failed to complete any services since the inception of Division litigation in 2017 involving H.W., A.F.'s older child. The judge found that R.W.'s admitted penchant for intimidating and arguing with others, including his service providers, prevented him from completing Division mandated services. The judge found that R.W. continued to test positive for substances and that R.W. admitted to Dr. Singer that he was unlikely to discontinue marijuana use. She also noted that R.W. never had custody of C.W. and that his chronic non-compliance hindered any extended interaction with C.W. in visitation settings.

Citing his termination from multiple substance abuse programs, therapeutic services, counseling, and visitation programs, the judge found R.W. did not prioritize successful completion of the parenting services necessary for reunification with his daughter. The judge concluded that these ongoing

problems harmed the child. The record shows that these factual findings are not "so wholly insupportable as to result in a denial of justice . . . " Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 483-84 (1974). In fact, the detailed testimony in the record reveals sufficient substantial and credible evidence to justify affirming the judge's finding that R.W.'s actions, including but not limited to his track record of non-compliance with Division programs before C.W.'s birth, caused C.W. harm under N.J.S.A. 30:4C-15.1(a)(1).

We turn next to R.W.'s argument that he was deprived of due process because he was unaware of the Division's specific allegations against him. Specifically, he claims that the guardianship complaint "only alleges generically that R.W. was unwilling or unable to eliminate the harm facing C.W. and was unwilling or unable to provide a safe and stable home."

> [I]t is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.
>
> [State v. Robinson, 200 N.J. 1, 20 (2009) (citing Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).]
>
> Except as otherwise provided by R[ule] 1:7-5 and R[ule] 2:10-2 (plain error), no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the

10

jury retires to consider its verdict, but opportunity shall be given to make the objection in open court, in the absence of the jury. A party shall only be prejudiced by the absence of an objection if there was an opportunity to object to a ruling, order or charge.

[R. 1:7-2.]

"Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." Ibid. However, in the interest of justice, the appellate court may notice plain error not brought to the attention of trial court. Ibid.

While not compelled to do so, for completeness' sake we briefly address the merits of the argument. R.W. argues that New Jersey Division of Youth & Family Services v. B.M., supports his proposition that the Division did not provide sufficient notice of the allegations against him in the guardianship complaint, thereby violating his due process rights. 413 N.J. Super 118 (App. Div. 2010). The case, however, is distinguishable. In B.M., a termination of parental rights action, the trial judge questioned Division caseworkers and learned that the child suffered from fetal alcohol syndrome caused by the mother's alcohol abuse. Id. at 127. This medical diagnosis had been documented by an expert, who had prepared a written report. Ibid. The disclosure surprised the parents defending the termination case, as no notice of

the complex medical issue had been provided to them by the Division in either its Title 9 abuse and neglect complaint or in its Title 30 guardianship complaint. Id. at 124-25. We held that the parents' due process rights were violated where they did not have an opportunity to adequately prepare for trial by reviewing the expert's report in advance and/or producing their own witness at trial. Id. at 127.

Unlike the parents in B.M., R.W. cannot credibly claim surprise. The allegations against him stem from nearly three years' worth of his non-compliance with Division programs and combative behavior towards Division representatives and security personnel. The testimony adduced at trial by the Division focused almost exclusively on R.W.'s conduct, with the exception of Dr. Singer's bonding evaluation of C.W. and her foster parent.

R.W.'s prior knowledge of the allegations against him is well supported by the record before us. He was on notice that the Division based its termination of parental rights action on his failure to comply with services to address his continuous substance use, mental health issues, as well as his confrontational and threatening behavior. First, R.W. appeared, with counsel, at the June 11, 2019 permanency hearing where the court approved the plan of termination of parental rights and adoption for C.W. based on R.W.'s untreated substance abuse and mental issues, inconsistent visitation, and his aggressive and violent

tendencies. Next, on September 5, 2019, R.W. attended a compliance review where he represented that he would attend substance abuse treatment, therapy and medication management. Finally, on October 3, 2019, R.W. appeared with counsel at another compliance review where he was ordered to comply with substance abuse treatment, parenting skills, therapy, and psychiatric treatment. The record shows that R.W. was repeatedly informed of his well-documented parenting challenges, yet he failed to take steps to correct these concerns. Tellingly, during his clinical interview, R.W. stated to Dr. Singer that the reason C.W. was not in his care was due to his history of substance use, his failure to engage in services, and his arguments with security guards and Division personnel. R.W. understood and had ample notice of the allegations against him. We find no violation of R.W.'s due process rights on this comprehensive record. Having disposed of R.W.'s arguments on appeal, we note that he does not argue any error by the judge with respect to prongs two through four of N.J.S.A. 30:4C-15.1(a). We find adequate substantial and credible evidence in the record to support the judge's findings as to each prong. We see no reason to disturb her order to terminate R.W.'s parental rights. Any additional arguments raised by R.W. not specifically addressed here lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

A-3116-19

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3116-19